SETH MORRIS (SBN 244910)
FATIMA SILVA (SBN 278891)
MORRIS LAW PC, A CRIMINAL DEFENSE FIRM
2025 Rose Street, Suite 200
Berkeley, CA 94709
phone: 510-225-9955
fax: 510-225-9661
www.morrisdefense.com
contact@morrisdefense.com

Attorneys for Defendant
JAMES PAUL WALSH III

UNITED STATES DISTRICT COURT

NOTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES PAUL WALSH III,<br><br>Defendant. | DOCKET NO. 24-CR-0487-JSW<br><br>SENTENCING MEMORANDUM<br><br>Date: February 10, 2026<br>Time: 1:00 p.m.<br><br>The Honorable Jeffrey S. White, Senior United States District Judge |

**INTRODUCTION**

JAMES PAUL WALSH III is a 45-year-old man with no significant criminal history, who committed a crime completely inconsistent with his character and the values he was taught by his parents. A highly educated and accomplished financial services executive and strategy consultant, Mr. WALSH always strived to be a law-abiding citizen. Although not amounting to a defense, Mr. WALSH is embarrassed to say the conduct in the alleged incident was a

1

manifestation of his struggles with methamphetamine abuse. Mr. WALSH's post-incident treatment has discovered a previously undiagnosed dissociative disorder that he now understands led to binge substance abuse, extreme self-loathing, and self-destructive behavior which clouded his judgement and severely altered his behavior. He feels great remorse, having come to terms with the fact that his actions were anti-social, harmful, and criminal.

Mr. WALSH knows the crimes he committed are not reflective of who he is, and he knows that he has let his community and his family down in this case. He also now feels he has the tools, the proper diagnosis, and the appropriate treatment to move forward in his life in a positive manner, and to continue to constructively contribute to society, albeit in a new way. He now wants to help others who may be dealing with substance abuse issues due to unresolved inner turmoil.

Since his arrest in March of 2024, Mr. WALSH has maintained sobriety and immersed himself in a treatment regimen that has led to significant self-improvement. Given his intense post-incident treatment, his strong family support, and the other stabilizing forces in his life like his education and professional skills, he asks the court to consider that this conduct is aberrant to his true character.

## STATEMENT OF CASE

On September 5th of 2024, Mr. WALSH was charged with a violation of 18 U.S.C. § § 2252(a)(4)(B) and (b)(2) as well as a Criminal Forfeiture Allegation pursuant to 18 U.S.C. § 2253(a). On July 15, 2025 the defendant pled guilty to Count One of the Indictment. Judgement and Sentencing is set for February 10, 2026 at 1:00 p.m. before the Honorable Jeffrey S. White, Senior United States District Judge.

//

//

//

2

# STATEMENT OF FACTS

## A. THE FACTS OF THE OFFENSE

The charges above stem from a methamphetamine-induced binge that caused the defendant, Mr. JAMES PAUL WALSH III, to utilize an online platform to engage in an inappropriate sexual conversation with an undercover officer posing as a child and purchase child sexual abuse content online. Notably, Mr. WALSH was not originally investigated for possession child pornography. When speaking with arresting officers after the sting operation, he volunteered that he possessed child pornography and that it was in his home on his laptop. Police then entered his home and seized his electronic devices with his consent, leading to the forensic examination that confirmed what he told them he possessed. The forensic analysis of his laptop only found child pornography that had been downloaded within the two weeks prior to his arrest, consistent with the timing of his binge.

## B. PERSONAL HISTORY OF MR. WALSH

### a. Upbringing and Early Life

Mr. WALSH was born on December 18, 1980, and grew up in Boulder, Colorado, with his parents, James and Carol, and sister Annie. Being part of a traditional family in the 1980s, Mr. WALSH spent a significant amount of time with his mother, who took care of the home. Mr. WALSH's father, while being the bread winner of the family, was still a present father figure in his life. The family took frequent vacations in the mountains and maintained a strong relationship with one another, even when Mr. WALSH and his sister eventually left the state for college. (See Exhibit A: Letters of Support; James P. Walsh).

Mr. WALSH describes himself as a quiet child, rarely causing issues for his parents and often internalizing his emotions to be less of a burden. Mr. WALSH was praised by his parents for his placidity, incentivizing him to continue to internalize the things he was feeling. Due to a childhood of self-soothing, lack of emotional support, and general introversion, Mr. WALSH

never learned to deal with his emotions in a healthy way. Mr. WALSH believed, for much of his life, that this was a normal way to cope. (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.).

As a teenager, Mr. WALSH often turned to alcohol and drugs to cope with the daily anxieties of life. Unable and unwilling to share his struggles with those around him, substance abuse was the one thing that took his mind elsewhere. Mr. WALSH's substance abuse worsened after graduating high school when Mr. WALSH enrolled in the University of California, Santa Barbara. While Mr. WALSH's addiction was prevalent, he graduated, earning a Bachelor's degree in Math and Economics. During his time at UCSB, Mr. WALSH met his now ex-wife, Erin, with whom he later had a son, James Walsh.

**b. Adult Life and Career**

After graduating from UCSB, Mr. WALSH began his career in finance and at age twenty-five, sought treatment for substance abuse, maintaining his sobriety for the next ten years. During this time Mr. WALSH earned a Masters in Business Administration from the University of California, Los Angeles. Upon graduating from UCLA, Mr. WALSH ventured into the world of strategy consulting and became a project leader for the Boston Consulting Group, working in their Los Angeles office. (See Exhibit A: Letters of Support; James P. Walsh).

Mr. WALSH was in a great place. He had a loving wife and son, a great job, and a house to call his own. However, due to the compounding stress of fatherhood and working 80-hour weeks, his mental and physical health declined. The combination of work travel, often working through weekends, and being away from his network of support back home drastically affected Mr. WALSH. Evidently, Mr. WALSH excelled in this type of environment, being rewarded for his compliance and lack of emotion (See Exhibit B: Harmony Place Letters; Mark F. Schwartz, Ph.D.). While Mr. WALSH was successful in his work, his mental health was slowly declining. Mr. WALSH sought treatment for the issues he was experiencing and was consequently

misdiagnosed with both Depression and ADHD and prescribed medications that ultimately worsened his condition.

### c. Cycles of Addiction, Sobriety, and Relapse

Mr. WALSH was prescribed amphetamines to treat his mental health diagnoses. When he eventually stopped taking the prescribed medication, Mr. WALSH was eager to find a replacement that provided him with the same energy and focus, having formed a dependence on the drug as it allowed him to stay up and work without sleeping. Mr. WALSH began taking methamphetamine to keep up with his demanding work schedule. His work in strategy consulting was grueling. Mr. WALSH was expected to work through the night most days and was required to take frequent work trips. Methamphetamine allowed Mr. WALSH to meet these outrageous expectations and excel in his work. However, as time went on, the compounding effects of consistent methamphetamine use, lack of sleep, and social withdrawal proved to be detrimental to Mr. WALSH's health. While Mr. WALSH recounts his time on methamphetamine as being the worst of his life, he continued to use the drug, unable to break the cycle of addiction.

As Mr. WALSH's addiction grew, the people in his life urged him to seek out treatment. His journey of combating his methamphetamine addiction proved to be difficult. A downward spiral ensued that ultimately left Mr. WALSH divorced, unemployed, and alone. After undergoing a series of treatments, Mr. WALSH was able to see his son on the condition that he stayed sober. He maintained sobriety for a significant period, motivated in large part by the ability to spend time with and bond with his son. Mr. WALSH secured a position as Managing Director at Charles Schwab and his career took off again.

During the height of the pandemic, isolated after losing his wife, friends, and sense of community, he relapsed. Unable to see his son and having been cast away by his loved ones, Mr. WALSH turned inward. Mr. WALSH further isolated himself, harboring deep feelings of self-contempt. These feelings manifested in self-destructive behaviors. Loss of time with his son

greatly affected Mr. WALSH and rebuilding his relationship with him is a key part of Mr. WALSH's plan for recovery and rehabilitation. (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.).

After relapsing during the pandemic, Mr. WALSH continued to struggle with his addiction on and off until his arrest. Mr. WALSH's drug abuse, social isolation, and rigorous working conditions caused him to turn to pornography as an additional means to self-medicate. When Mr. WALSH was abusing drugs, he would often view pornography, sometimes for extended periods of time and sometimes obsessively. Significantly, the pornography he was viewing at that time was adult pornography. During binges, Mr. WALSH found that the drug heightened his sex drive and made him want to seek pornography out. Mr. WALSH has stated explicitly that without the presence of methamphetamine in his system; he had no interest in this behavior whatsoever. Mr. WALSH managed to maintain his demanding job as Managing Director until shortly after his arrest.

Mr. WALSH's consistent struggle with addiction has tainted the better part of his life. Mr. WALSH recounts moments of his addiction during which he felt completely out of control. Mr. WALSH's addiction to methamphetamine stems from years of internalizing his emotions, engaging in self-harming behaviors, and putting pressure on himself to succeed. Throughout childhood and into his adult years, Mr. WALSH has effortlessly played the part of an uncomplicated, insouciant man, untouched by the common anxieties of life. In truth, Mr. WALSH has been grappling with mental health struggles for much of his life completely on his own and self-medicating to get by.

### d. The Day of the Incident and Arrest

In the days leading up to his arrest, Mr. WALSH was in the height of a two-week methamphetamine binge and hadn't slept for over four days. Mr. WALSH's behavior was a direct product of his methamphetamine abuse, lack of sleep, and lack of social interaction.

**e.  Post-Incident Conduct and Treatment**

Since his arrest in March of 2024, Mr. WALSH has made significant strides in bettering his mental health and working towards long-term sobriety. Mr. WALSH's treatment since his arrest has consisted of the following:

**i.  March 20, 2024 – May 17, 2024: Duffy's Napa Valley Treatment:**

**Inpatient Foundational and Extended Care Programs;**

Mr. WALSH admitted himself to Duffy's Napa Valley Treatment's Foundational and Extended Care Program a few weeks after his arrest. On the come down from his methamphetamine induced binge, Mr. WALSH was desperate for stability and guidance. The work Mr. WALSH completed at Duffy's helped him understand the root cause of his behavior and addiction. The two-month-long residential program consisted of weekly sessions with a therapist and substance abuse counselor as well as programming seven days a week from 8:00 am to 8:00 pm. (See Exhibit C: Duffy's Letters; Araceli Cortez BSW).

**ii.  May 17, 2024, to May 23, 2024: Duffy's Napa Valley Treatment:**

**Outpatient Day Treatment with Sober Living**

Following his completion of the Duffy's Foundational and Extended Care Programs, Mr. WALSH enrolled in a six-day-long Outpatient Day Treatment Program. In this stage, Mr. WALSH was educated on the "bio-psycho-social aspects of addiction" (See Exhibit C: Duffy's Letters; Cara Olmedo RADT). Mr. WALSH was required to continue attending individual and group therapy sessions as well as peer group exchanges. (See Exhibit C: Duffy's Letters; Cara Olmedo RADT).

**iii.  May 28, 2024, to September 30, 2024: Harmony Place Monterey: Partial**

**Hospitalization Program**

Mr. WALSH, having exhausted the options offered at Duffy's, was yearning for a different approach. Through his research, he found Harmony Place Monterey, a mental health

clinic in Monterey, California that specializes in chemical dependency treatment. Since May of 2024, Mr. WALSH has remained in treatment there with Dr. Mark Schwartz and other clinicians. The programs at Harmony Place, like Duffy's, seek to find and address the root causes of individuals' addictions. Mr. WALSH has poured everything into his time in treatment, treating it "like a full-time job" (See Exhibit A: Letters of Support; James P. Walsh).

Upon arrival, Mr. WALSH was evaluated by Clinical Director, Dr. Mark Schwartz, who determined that Mr. WALSH's primary diagnoses are Dissociative Disorder and Substance Use Disorder. Mr. WALSH's substance abuse was an attempt to self-treat his Dissociative Disorder. Evidently, the consistent use of psychotropic drugs caused more issues than it helped given the fact that Mr. WALSH hadn't received a proper diagnosis until he began treatment at Harmony Place. (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.).

Mr. WALSH's treatment at Harmony Place was anything but casual or intermittent. During his Partial Hospitalization Program, he attended treatment five days per week, Monday through Friday. For over three months, Mr. WALSH participated in programming for six hours per day, from 8:00 a.m. to 2:30 p.m. While in this regimented treatment, Mr. WALSH participated in group and individual therapy sessions, psychoeducation, relapse-prevention planning, and clinical monitoring ensuring abstinence. During this time, Mr. WALSH met with Dr. Schwartz three times a week and met with the Harmony Place physician weekly to find medication appropriate for his diagnoses (See Exhibit B: Harmony Place Letters; Lee Goldman M.D.).

### iv. October 1, 2024, to October 31, 2025; Harmony Place Monterey: Intensive Outpatient Program

After fully completing the Partial Hospitalization Program, Mr. WALSH then stepped down to the Intensive Outpatient Program at Harmony Place. In this program, Mr. WALSH

attended programming three to five days per week for several hours each day, approximately 9:00 a.m. to 12:30 p.m. This phase, while less rigorous, still required consistent attendance, active participation, sobriety monitoring, compliance with therapeutic assignments, and continued trauma-focused and behavioral therapy. Even after stepping down to a reduced schedule, Mr. WALSH remained under Dr. Schwartz's supervision, seeing him two to three times a week for hour-long sessions and maintaining accountability, demonstrating behavioral stability, and continuing structured treatment. (See Exhibit B: Harmony Place Letters; Lee Goldman, M.D.).

Multiple senior clinicians at Harmony Place, with decades of experience in treating sexual compulsivity, trauma, addiction, and substance abuse, describe Mr. WALSH as someone whose conduct arose from a convergence of substance abuse, unresolved trauma, and psychological distress. Lori Galperin, MSW, LCSW, a Senior Therapist and co-founder of Harmony Place, reports that based on nearly 14 months of direct observation in group, family, and individual therapy, Mr. WALSH does not present as a danger to children and instead exhibited empathy, decency, and genuine remorse. She specifically distinguishes his behavior from that of individuals driven by sexual interest in children, describing his conduct as out-of-character and rooted in a self-destructive spiral rather than malicious intent (See Exhibit B: Harmony Place Letters; Lori Galperin, MSW, LCSW).

### v. October 1, 2025, through present; Harmony Place Monterey: Continued Treatment and One on One Therapy with Dr. Schwartz

Since completing both the Partial Hospitalization and the Intensive Outpatient programs at Harmony Place, Mr. WALSH has moved on to weekly therapy sessions with Dr. Schwartz. Dr. Schwartz has watched Mr. WALSH grow as a patient, taking accountability for his actions, seeking out healthy coping mechanisms, and working to resolve years of developmental trauma that ultimately led to his addiction (See Exhibit B: Harmony Place Letters; January 2026 Letter

from Mark F. Schwartz, Ph.D.). Dr. Schwartz recommends that Mr. WALSH continue treatment to further combat his dissociative symptomology, seek out work that is less demanding, and lean into the support systems he has in place (See Exhibit B: Harmony Place Letters; January 2026 Letter from Mark F. Schwartz, Ph.D.).

Dr. Mark F. Schwartz has spent more than 50 years treating compulsive sexual behaviors and assessing risk for courts, correctional systems, and hospitals. Dr. Schwartz reports that Mr. WALSH has maintained abstinence from substances and pornography, demonstrated minimal cravings, and shown measurable psychological transformation. Based on his professional, clinical assessment, Dr. Schwartz concludes that Mr. WALSH is not a pedophile, that no child is at risk, and that relapse is unlikely. He further notes that Mr. Walsh has resolved core trauma underlying his conduct and is uniquely positioned to use his recovery to help others facing similar histories of abuse and shame rehabilitation (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.).

Mr. WALSH's therapist of over five years, Noelle Clason, LMFT, provides insight into Mr. WALSH's background in reference to the treatment he has received. Ms. Clason explains how Mr. WALSH's life was dominated by extreme professional pressure, dissociation, and cycles of overcontrol followed by self-destructive relapses (See Exhibit A: Letters of Support; Noelle Clason, LMFT). Ms. Clason believes that these patterns were rooted in trauma and emotional disconnection, and that the behavior leading to Mr. WALSH's arrest occurred during an unusually intense period of self-destruction, not from any desire to harm others. She additionally describes a fundamental break from Mr. WALSH's lifelong "over-control/out-of-control" cycles and documents his growing emotional awareness, distress tolerance, and capacity for self-care. (See Exhibit A: Letters of Support; Noelle Clason, LMFT).

//

//

**f.    Strong Character References from Friends and Family**

Those who are close to Mr. WALSH opted to write letters in support of him, his character, and his commitment to rehabilitation. From the various letters in support of Mr. WALSH, a consistent picture emerges of a man who, at his core, is deeply kind, empathetic, and devoted to those he loves. It is evident that Mr. WALSH has made a lasting impact on the people in his life and while the allegations against him have been difficult to grasp, they have not deterred his loved ones from supporting him.

Mr. WALSH's father, James P. Walsh, recounts Mr. WALSH's stable, loving childhood and his tendency for kindness and empathy (See Exhibit A: Letters of Support; James P. Walsh). Mr. Walsh describes Mr. WALSH's professional success and additionally acknowledges his struggles with addiction, explaining how the family has supported him through multiple treatment efforts. Mr. Walsh details Mr. WALSH's immediate decision to enter residential treatment after his arrest and his subsequent commitment to therapy, education, and self-improvement. Mr. Walsh is committed to supporting Mr. WALSH through his treatment, incarceration, and re-entry in every way possible.

Mr. WALSH's mother, Carol Walsh, has similar sentiments to share regarding her son. Ms. Walsh attests to the general selflessness and kindness exuded by Mr. WALSH from childhood (See Exhibit A; Letters of Support; Carol Walsh). Ms. Walsh details the emotional strain experienced not only by Mr. WALSH, but herself and her husband as they have navigated this situation. Regardless of the outcome, Ms. Walsh believes that Mr. WALSH will stay committed to his treatment and self-betterment. "He often talks about rebuilding his life in a way that fits him—less pressure, more meaning—and he is taking real steps in treatment to make that happen" (See Exhibit A: Letters of Support; Carol Walsh). Ms. Walsh and her husband have been the cornerstone in Mr. WALSH's support system, visiting him throughout treatment and providing him with stability during this tumultuous time.

Mr. WALSH's mother and father remain in constant contact with him, attending every court hearing, visiting regularly, participating in family therapy, and committing to providing him with unwavering emotional support regardless of the sentence imposed. Both parents emphasize the heartbreak of the distance between Mr. WALSH and his son, James, and the profound motivation this provides for Mr. WALSH to continue healing and rebuilding his life responsibly.

Annie Kahr, Mr. WALSH's younger sister and a public health analyst, describes him as a constant, loving presence throughout her life who has always been caring, protective, and emotionally sensitive (See Exhibit A: Letters of Support; Annie Kahr). Ms. Kahr recounts his lifelong work ethic, noting how he excelled in sports and academics and later channeled that same drive into his career, often under immense pressure and fear of failure. Ms. Kahr explains that over the past year and a half she has seen Mr. WALSH redirect that determination inward through treatment and self-reflection, tackling his challenges with the same persistence he has shown in other areas of life. She expresses strong confidence in his growth, emphasizes the supportive community surrounding him, and affirms her ongoing commitment to stand by him.

Mr. WALSH's brother-in-law, Anthony Kahr, M.D., has known him for over eighteen years. During this time, Dr. Kahr has observed Mr. WALSH to be caring, hardworking, and a devoted family member (See Exhibit A: Letters of Support; Anthony Kahr). Dr. Kahr explains that since entering treatment, Mr. WALSH has become more forthcoming about his struggles, opening up to his family and close friends about the years of addiction, emotional turmoil, and stress he has endured in silence. Like Mr. WALSH's family, Dr. Kahr is committed to supporting Mr. WALSH throughout this process and believes he has the necessary tools for continued self-improvement and rehabilitation.

Katherine Kahr, an extended family member of Mr. WALSH and a retired psychotherapist, describes Mr. WALSH as intellectually curious, thoughtful, and deeply

committed to understanding himself (See Exhibit A: Letters of Support; Katherine Kahr). Based on her professional background and personal observations, she expresses confidence that Mr. WALSH has the strength and resilience necessary to rehabilitate himself and live a productive, meaningful life.

A close friend of Mr. WALSH's for over six years, Courtney Goen, has comparable thoughts about Mr. WALSH's character. Ms. Goen describes Mr. WALSH as a person of integrity, exceptional work ethic, and deep empathy for others. Ms. Goen acknowledges Mr. WALSH's long struggle with addiction and self-worth, explaining how isolation during COVID and unhealthy overworking contributed to his relapse and eventual arrest. She describes witnessing Mr. WALSH's transformation since entering inpatient treatment in March 2024 and long-term outpatient care, noting his increased self-awareness, compassion, and commitment to recovery. "I believe these events are in no way a representation of who [Mr. WALSH] is at his core" Ms. Goen says (See Exhibit A; Letters of Support; Courtney Goen). "In the six years we have been close friends, I have only witnessed a loving and integrous person; a gentle person, but one who has also suffered from addiction and emotional illness" (See Exhibit A: Letters of Support; Courtney Goen).

These letters in support of Mr. WALSH uniformly acknowledge his long struggle with addiction and mental health, along with his selflessness and motivation for rehabilitation. Both his father and brother-in-law describe years of substance abuse and emotional turmoil, while emphasizing that Mr. WALSH never sought to harm others and instead turned that pain inward. Mr. WALSH spent many years of his life suffering in silence, compounding his struggles by turning inward and abusing substances for relief, rather than reaching out to his support system that has been there all along. Mr. WALSH, having been forthcoming with his loved ones since his arrest, has a strong support system in place that will help him through all aspects of his rehabilitation.

Importantly, none of these letters attempt to minimize the seriousness of his offense. Instead, they consistently describe Mr. WALSH's profound remorse, deep shame, and full acknowledgment of the harm caused. Multiple family members describe the severe consequences he has already endured, including the loss of his career, housing, custody, and reputation, underscoring that accountability has already been significant and life-altering. Mr. WALSH is a man who has taken responsibility for his actions, engaged deeply in treatment, and demonstrated meaningful, sustained change. Loved ones in support of Mr. WALSH respectfully ask the Court to consider a sentence that holds him accountable while allowing him to continue the life-saving work of recovery and reentry that he has already so earnestly begun.

Throughout the process of rehabilitation, Mr. WALSH has demonstrated a renewed commitment to living a healthier, more grounded life, stepping away from the high-stress corporate environment that once dominated his life. Mr. WALSH has been volunteering at a local hospice facility and has taken considerable steps in continuing his education, tailoring his coursework to pursue a career in counseling. Mr. WALSH completed a UC Berkeley Extension course in counseling and is pursuing further certification and degrees in Counseling and Trauma Studies from Monterey Peninsula College and Pacific Oaks College. Ultimately, Mr. WALSH hopes to gain the knowledge to help guide individuals like himself toward rehabilitation. Mr. WALSH additionally hopes to reconnect with his son and surrounding family in Colorado.

Taken together, these materials present a rare case in which the goals of sentencing, namely punishment, deterrence, protection of the public, and rehabilitation, are already being meaningfully advanced. Mr. WALSH has demonstrated extraordinary post-offense rehabilitation through sustained, voluntary treatment, profound personal accountability, and a clear commitment to a law-abiding, service-oriented future. The Court is not being asked to gamble on his potential for change; Mr. WALSH has shown concrete proof of it, documented by independent clinicians, family members, and years of consistent conduct. Mr. WALSH has

demonstrated compliance with all court orders. Mr. WALSH wishes to further his treatment by taking advantage of the Residential Drug Abuse Program (RDAP) and Sex Offender Treatment Program (SOTP) while in custody.

In light of that and based on the facts and circumstances of the case and the individual characteristics of Mr. WALSH, counsel requests that the court recommend that Mr. WALSH be placed at Federal Correctional Institute (FCI) Englewood, in Littleton, Colorado. FCI Englewood is a low-security facility that offers RDAP and SOTP and is located within an hour's drive of Mr. WALSH's parents' home in Boulder, Colorado. SOTP and RDAP would provide him with proper counseling and psychological services during his incarceration. Mr. WALSH's placement at FCI Englewood would allow his family to visit him more frequently and maintain their support, further aiding Mr. WALSH's rehabilitation and eventual reintegration.

SOTP is listed under The Federal Bureau of Prisons' Policy Statement 5324.10. Eligibility for participation in the SOTP program is conditional on an inmate's evaluated risk of recidivism. Inmates who qualify must voluntarily decide to join and openly share and take accountability for their charges. Since his arrest, Mr. WALSH has consistently acknowledged his actions, demonstrated accountability throughout the course of this case, and engaged openly in treatment. Furthermore, Dr. Mark Schwartz's psychological examination concluded that he is not likely to commit a similar offense. (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.). This places Mr. WALSH within The Federal Bureau of Prisons' eligibility framework for SOTP participation.

## ARGUMENT

### A. WHEN CONSIDERING ALL OF THE RELEVANT FACTORS IN 18 U.S.C. § 3553 A SENTENCE OF 36-48 MONTHS IS APPROPRIATE FOR MR. WALSH.

The goal of the court at sentencing is to impose a sentence that is reasonable. *See United States v. Carty*, 520 F.3d 984, 990-91 (9th Cir. 2008); *United States v. Mohamed*, 459 20 F.3d 979, 987 (9th Cir. 2006). A defendant's guideline range is a starting point, but there is no

presumption that the guideline sentence is correct. See Carty, 520 F.3d at 90-91; *see generally United States v. Miqbel*, 444 F.3d 1173, 1175 fn.1 (9th Cir. 2006) (all sentencing guidelines and policy statements are advisory). Moreover, sentencing courts have the authority to disagree with the guideline range on policy grounds. (*See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).) In *Kimbrough*, the Supreme Court held that sentencing courts could disagree with the guideline sentence for defendants convicted of possessing crack cocaine because the 100 to 1 sentencing disparity for crack and powder cocaine was not based on empirical study, but rather on mandatory minimums set by Congress. (*Kimbrough*, 552 U.S. at 109-10.)

As the probation department and the parties agree, Mr. WALSH's guideline imprisonment range is 78 – 97 months. The government, by way of plea agreement, has agreed not to argue for more than 60 months.

There is no limitation to the information that a court may consider when determining an appropriate sentence. See 18 U.S.C. § 3661; U.S.S.G. § 1B1.4. The court's discretion is guided by 18 U.S.C. § 3553, which sets forth several factors that should be considered. Specifically, the court should consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for-- (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines-- (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …; (5) any pertinent policy statement-- (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28 United States Code, subject to any amendments made to such policy statement by act of Congress …. (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

In the instant action, and when all the relevant factors are considered, Mr. WALSH should receive a sentence of no more than 36-48 months in federal prison. The conduct in the instant action was caused by a multitude of factors, but most significantly an isolated lapse in judgment for an otherwise meticulous, hard-working, and peaceful man.

The characteristics and background of Mr. WALSH are atypical of many federal criminal defendants. Mr. WALSH is an established businessman and academic, having worked for many top corporations. Additionally, Mr. WALSH is different in that he has already sought treatment for his mental health struggles and drug addiction that ultimately led to the alleged incident. Mr. WALSH has made a significant effort to maintain his sobriety, address the root cause of his addiction, and work towards a balanced and sustainable lifestyle.

A sentence of 36-48 months is sufficient to "reflect the seriousness of the offense, promote respect for the law, provide just punishment," and protect the public. Mr. WALSH's criminal conduct was motivated by a methamphetamine-induced binge that completely altered his mental state. Regardless of Mr. WALSH's mental state at the time, he accepts full responsibility for his actions. Mr. WALSH deeply regrets his conduct and is committed to bettering himself, hoping to one day help others in his same situation. Mr. WALSH is eager to pay any restitution deemed necessary by the court and has agreed to hold that money in trust. Mr. WALSH has, and will continue to do, everything he can to ensure this is an isolated incident. Mr. WALSH understands the impact of his actions and wishes he was able to undo the harm he has caused.

Mr. WALSH, despite the grave lapse in judgement this case represents, still has a strong support system and he has demonstrated that he can be a productive member of society. He is clearly open to continued treatment and vocational training. Moreover, Mr. WALSH is one of the most genuinely contrite defendants I have ever represented. He has expressed remorse and contrition every time I have met with him and every time I have discussed this case with him. He

will spend his remaining days doing all he can to redeem himself in the eyes of his family and his community. The support he has from his family and the community is overwhelming. It represents the strongest community support I have ever seen in a client. Thus, considering all of the relevant characteristics, it is requested that Mr. WALSH be sentenced to 36-48 months in federal prison, a sufficient punishment to meet the requirements of 18 U.S.C. § 3553.

## CONCLUSION

Mr. WALSH now respectfully requests that this Court impose a sentence of 36-48 months imprisonment and make the following Judicial Recommendations.

## REQUEST FOR JUDICIAL RECOMMENDATIONS

Mr. WALSH respectfully requests that the Court consider the following Judicial Recommendations that are in the best interest of Mr. WALSH's rehabilitation and reentry and are supported by his provider, Dr. Schwartz:[1]

### A. Designation to Sex Offender Management Program (SOMP) Facility

To further Mr. WALSH's rehabilitation, we request his designation to the low-security FCI Englewood, Colorado. FCI Englewood is a Sex Offender Management Program (SOMP) institution,[2] which are the only facilities that offer the Sex Offender Treatment Program (SOTP).[3] Additionally, these facilities provide more robust Psychology Services departments and additional psychological treatment opportunities. FCI Englewood is the closest low-security, SOMP facility to Mr. WALSH's release residence in Boulder, Colorado.[4]

---

1 FEDERAL BUREAU OF PRISONS, INMATE SECURITY DESIGNATION & CUSTODY CLASSIFICATION, PROGRAM STATEMENT NO. 5100.08, ch. 5, p. 3 (2025) (discussing the Bureau's consideration of sentencing court Judicial Recommendations and procedures for compliance); FEDERAL BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS at § IV(D)(1) (2025) ("The J&C may indicate the sentencing court's recommendation to house the inmate in a specific institution, geographic area, or specialized program.").

2 FEDERAL BUREAU OF PRISONS, SEX OFFENDER PROGRAMS, PROGRAM STATEMENT NO. 5324.10, § 1.1 (2025) ("Sex Offender Management Programs (SOMP) are provided at designated institutions to assist in the effective management of the Bureau's population of sexual offenders and to provide services that minimize this population's risk for sexual reoffense.").

3 Id. at ch. 3 ("Sex offender treatment programs in the Bureau are Psychology Treatment Programs provided as a component of the Sex Offender Management Program (SOMP). SOMP institutions are required to offer sex offender treatment services.").

4 See FEDERAL BUREAU OF PRISONS, INMATE SECURITY DESIGNATION & CUSTODY CLASSIFICATION, PROGRAM STATEMENT NO. 5100.08, ch. 1, p. 2 (2025) (discussing the Bureau placing prisoners "in a facility as close as practicable to the prisoner's primary

18

Additionally, Mr. WALSH has engaged with a similar program under the supervision of U.S. Pretrial Services, the HOPE program, where he has been enrolled since November 4, 2024 (See Exhibit D: HOPE Program Clinical Report). Mr. WALSH has completed over fifty classes and has a positive progress report (See Exhibit D: HOPE Program Clinical Report). Since beginning treatment with the HOPE Program, Mr. WALSH has improved his emotional regulation and awareness and has developed helpful strategies to help him process the major life change he is about to endure (See Exhibit D: HOPE Program Clinical Report).

We specifically request the following Judicial Recommendation:

- Designation to FCI Englewood to participate in the Non-Residential Sex Offender Treatment Program and to facilitate family visitation.

**B.  *Referral to Residential Drug Abuse Program (RDAP)***

RDAP, listed under 18 U.S.C. § 3621(e), is an intensive program offered to eligible inmates in certain facilities under the Bureau of Prisons. The eligibility requirements are understood as follows: a substance use disorder diagnosis meeting DSM criteria, a signed program agreement accepting the responsibilities necessary to complete the program while in custody, and the ability to complete the three components of the program (unit-based treatment, follow-up, and community transitional treatment). Mr. WALSH meets the requirements listed as he has struggled with addiction for many years of his life, been diagnosed with Substance Use Disorder, and has shown great drive and dedication to his treatment thus far (See Exhibit B: Harmony Place Letters; Psychological Report by Mark F. Schwartz, Ph.D.). Based on counsel's findings and analysis of the Bureau of Prisons' policies counsel believes that Mr. WALSH is eligible for participation in RDAP.

We specifically request the following Judicial Recommendation:

residence, and to the extent practicable, in a facility within 500 driving miles of that residence").

19

- Recommendation to participate in the Residential Drug Abuse Program (RDAP)

**C. *Maximum Allowable Halfway House and Home Confinement Placement***

To facilitate Walsh's reintegration into society following his imprisonment and reduce his recidivism risk, we respectfully request that the Court recommend to the Bureau of Prisons that he receive priority and maximum allowable placement in halfway house and home confinement at the conclusion of his term of imprisonment.[5]

We specifically request the following Judicial Recommendation:[6]

- Maximum halfway house and home confinement placement to facilitate Walsh's reintegration into society.

Date: January 30, 2026

Respectfully submitted,

MORRIS LAW, PC

SETH MORRIS
Attorneys for Defendant
JAMES PAUL WALSH III

---

5 *See* FEDERAL BUREAU OF PRISONS, COMMUNITY CORRECTIONS CENTER (CCC) UTILIZATION & TRANSFER PROCEDURE, PROGRAM STATEMENT NO. 7310.04 (1998) (discussing use and policy governing federal halfway house placement at the end of the inmate's sentence).

6 *See* Memorandum from Assistant Director Blake R. Davis to Regional Directors, Wardens, and Residential Reentry Managers 3 (May 24, 2013) (discussing use of "[a]ny statement by the court that imposed the sentence" when considering halfway house placement); Memorandum from Assistant Director D. Scott Dodrill to Chief Executive Officers 2 (Jun. 24, 2010) (same); Memorandum from Assistant Director Joyce K. Conleyand Assistant Director Kathleen M. Kenny to Chief Executive Officers 2, 3 (Apr. 14, 2008) (clarifying that while the Court's recommendation is not binding, "[s]entencing court recommendations for a particular type institution, however, remain a factor to be considered when making pre-release RRC placement decisions").

# Exhibit A

August 13, 2025

Honorable Judge Jeffrey S. White
United States Courthouse
1301 Clay Street
Oakland, CA 94612

Dear Honorable Judge White,

My name is James P. Walsh, and I am Paul Walsh's father. I am 77 and a retired environmental scientist. Paul's mother, Carol (age 76), and I have been married for 46 years. We live in Boulder, Colorado, where Paul grew up.

Paul had a warm, stable childhood with his little sister in an intact family. Ours was a traditional marriage of the 1970s-80s: I did most of the breadwinning; Carol did most of the child-raising. When I came home from work, I played with the kids, ate dinner together, and helped put them to bed. Our family vacations were outdoors—hiking, camping, rafting, sailing, backpacking, biking, and road-tripping around the West. Those routines and those trips shaped Paul and kept us close.

After he left for college and began his career, we stayed reasonably close even though he was in California and we remained in Colorado. We spoke every few weeks and saw him at least a couple of times a year. We had a decent relationship with his now ex-wife, and we are working hard to maintain a relationship with his 12-year-old son, our beautiful grandson. Of all Paul's loved ones, he is the one I worry about most.

People have long described Paul as gentle, kind, and empathetic. He is soft-spoken, not opinionated or proud, and knows many people struggle. His kindness and intelligence made him well-liked and successful at school and work until the days before his arrest. The main point I want to convey is that when Paul puts his mind to something, he can almost always make it work. He is exceptionally bright and a hard worker. Those strengths took him to one of the most prestigious consulting firms in the world and then to an important role at one of the largest financial firms in the country, where his specialty was organizational change strategy. All of that ended the night he was arrested.

Paul has struggled with addiction, first with alcohol and later with crystal meth. We supported him through treatment twice before. When he was arrested, I had difficulty seeing beyond it—but I love my son, and with his prior addiction issues, Carol and I are doing what we can to help him turn the corner. We chose to help however we could: to try to understand him, to support him emotionally, and to contribute what we could toward therapy. I know this was the right decision.

Within a week of his arrest, Paul admitted himself to two months of residential treatment at Duffy's Napa Valley Rehabilitation. Upon completing the program, he returned to Oakland, pared down his belongings, and sold his house. Unsatisfied with the therapy he'd received—there and over the years—he searched for a different approach. His research led him to Harmony Place with Dr. Mark Schwartz in the Monterey area, a program focused on finding the root causes of addiction. For the past 15 months, he has treated recovery like a full-time job.

Throughout this period, we have stayed very close to Paul. He calls one or both of us nearly every day. We helped him close out his affairs, drove him to Duffy's, visited him there twice, and helped

him get organized and into Harmony Place. One or both of us have visited about every other month since. We have attended every hearing. We also met with Dr. Schwartz for family therapy, having some long, hard conversations about Paul's addiction and his charges.

The early months after the arrest were despairing. Paul felt he had lost everything—his reputation, son, career, home, and most of his friends. He faces a lifetime of shame and remorse; this crime feels uniquely life-crushing. And yet, he has been getting better. He told me he is going to survive. He said, "I don't want anything this terrible to ever happen to me or our family again." He has taken charge of his treatment, reading maybe a hundred books on trauma, addiction, treatment, neuroscience, psychotherapy, and philosophy, and spending hundreds of hours in individual and group therapy.

Through this work, Paul realized he had had a dissociative disorder for many years that fueled his addiction. He researched medications, found one used to treat PTSD, and persuaded his psychiatrist to let him try it—a drug on the approved federal prison list. Within a few weeks, he felt "whole" for the first time in years. In spite of the terrible place he is in, he called it "life-changing." To me, this shows how deeply he wants to get better. I have learned that some people say they want recovery but, for some "secondary benefit," do not honestly want to give it up; Paul does—more than anything else in the world, maybe more than life itself.

For the first time, he is building a plan for life after prison. He wants to pursue a correspondence degree in psychology so that he can help others in the terrible condition he has been in. He has been volunteering at a hospice, signing up for community-college courses, and even researching whether he could become a therapist one day. His voice on the phone sounds different now; for the first time in many months, there is hope.

Our plan as his parents is to stand by him if he goes to prison. We will visit and write. A voracious reader, he will benefit from books we can send through Amazon. We will be there when he gets out and faces a challenging world. The idea of being a felon and on a public registry is beyond words for me. My prayer is that he can start in sober living near us. We can support him for some time while encouraging him to be productive. Paul is very smart, committed, and hard-working, and I know he can make not just a living, but a life.

As Paul's dad, I respectfully ask you to consider a shorter rather than a longer sentence. I ask for a sentence that holds Paul accountable while allowing him to keep doing the work he's started. A shorter term—built around treatment and the medication that is finally helping him—will keep him engaged, bring him home sooner as a steady, sober father, and give him a real chance to put his talents to good use. It will also allow Carol and me, now 76 and 77, to stay closely involved in his recovery and reentry, while our support can make the greatest difference.

Thank you for considering a heartbroken father's plea for his son.

Respectfully,
James P. Walsh

R. Noelle Clason
3865 Howe st
Oakland, CA 94611

October 1, 2025

Dear Honorable Judge,

My name is R. Noelle Clason and I am a Licensed Marriage and Family Therapist in Oakland, California. James Paul Walsh (Paul) has been a client of mine since February 2021 and has been participating in once or twice weekly individual therapy since that time. Because Paul was a client of mine before his arrest and has remained consistent and committed to regular therapy with me since his arrest, I would like to provide some insight about him and his growth spanning that time period.

Paul has always been engaged in therapy and has demonstrated a desire to grow. In the first years of my work with Paul prior to his arrest, he was managing extreme stress is in his life. His career was intensely high-demand and high-pressure, and he was very devoted to being professionally successful and to meeting other people's professional expectations of him. During this time, he was also moving through a deeply difficult and fraught custody process with his ex-wife regarding their son. At this time, Paul had some cursory understanding of his patterns of dissociation but had limited self-awareness to be able to notice in the moment when that was happening and limited insight into how that impacted his life and behavior. His goals in his personal development, including our therapy, often were characterized by a desire to improve himself or manage his stress better, but he generally had low insight into the possibility that what he was demanding of himself (or others were expecting of him) was unhealthy for him and indeed unrealistic for most people. Indeed, many of the coping strategies that he drew on were actually dissociative in nature and were attempts to further disconnect from his own experience, distress, and needs in order to satisfy his own or others' unrealistic expectations of him and his behavior and performance.

He chronically minimized his own physical, social and emotional needs, and demonstrated longstanding patterns of attempting to overcontrol his behavior while neglecting himself, which would eventually (predictably) lead to out-of-control periods. He would work absurdly long hours, was socially isolated and had very few social relationships outside of work, and struggled to consistently notice and care for his basic body needs and self-care (food, sleep, fun, etc). These overcontrol period would then lead to chronic relapsing on drugs and alcohol and self-destructive behaviors, before beginning another more deeply committed overcontrol cycle (fueled by shame he felt about his out-of-control behavior). In the years I observed this overcontrol/out-of-control cycle during the course of our work together, his behaviors during his

out-of-control periods were always self-destructive in nature and were never characterized by desire or intent to harm others (physically, sexually, or otherwise). The behavior leading to his arrest happened during a particularly intense out-of-control, self-destructive period after a period of overcontrol and self-neglect during a time of acute, cumulative, overlapping stressors from different aspects of his life. However, I will note that my perspective is that his behavior during this particular self-destructive relapse period that led to his arrest was anomalous: more intense and also different in nature than any previous self-destructive out-of-control cycles. At no time has our work ever been focused on attraction to children or minors, or on desire to procure or view child pornography. I can say with great sincerity that at no point in my work with Paul, either before his arrest or after, have I heard anything from him that leads me to the impression that attraction to children or minors is or has ever been a salient erotic template for him.

Paul has always been very devoted to therapy and personal growth, has a lot of eagerness and energy to put toward learning and healing, and has an enthusiastic desire and willingness to apply himself. He loves to understand and to learn. Since his arrest, Paul has centered his life around trying to understand himself, his own patterns, his trauma, his dissociation, and his needs. In some ways, his arrest leading to his disengagement from his former job and career has been to his benefit holistically, and certainly in regard to his mental health. He has had the experience now of having a solid amount of time being separate from the influence that his professional position and industry had on him – and his stress level, wellbeing, and emotional functioning. With that time away to have a contrasting experience, he is able to not just understand intellectually but observe over time how much it was taking out of him. He has dedicated himself to learning about emotions, trauma, and dissociation, and committed himself to growing better able to observe his own internal state and try to respond to and attune to his needs in each moment, rather than engaging desperately in coping strategies to silence or ignore his inner signals. His sobriety since his arrest has been a reflection of this commitment, and hugely supported his growing self-awareness, distress tolerance, and ability to notice, feel, and manage his internal states. Because of this turn, he is no longer enacting overcontrol/out-of-control cycles and I observe that he deeply values the inner stability, resilience, and peace that it lends to his life.

In the time since his arrest, I have seen Paul recover a kindness and sweetness of spirit that I believe he has always had, but that haven't often been celebrated in some of the environments and contexts he has been in. He has a gentle nature; being truer to that aspect of himself has inspired him to explore his creativity and relationship with nature and break from a former fixation on productivity, status, and accomplishment. He has gradually opened up more to building friendships, and is doing so with great discernment so as to keep aware of tendencies toward people pleasing and avoid compromising his boundaries or values in ways that would be unhealthy for him.

I have the utmost faith in Paul's capacity for and commitment to continued rehabilitation. Should it be possible within the limits of the scope of my licensure based on where Paul ends up, after his incarceration I would be happy to resume therapeutic work with him as he makes the transition and endeavors to build a life for himself and a future that feels sustainable and purposeful; more suited to his authentic qualities and strengths, and less built on his perception of other people's expectations of how he should be and how his life should look. I trust that Paul's insight about himself has deepened to a degree that his life will never be shaped as it was in the past. He understands his sensitivity to the contexts he exists within and the need to choose those environments and relationships deliberately and with care. He is uninterested in the volatility and chaos that he has experienced at previous points in his life and has a sincere longing to find a sense of purpose where he can contribute and be of service in the world and with other people. I have great hope and curiosity about the life that he will build for himself going forward, given time.

Sincerely,

R. Noelle Clason
CA LMFT #111549
PhD Candidate in Human Sexuality

August 16, 2025

Honorable Judge Jeffrey S. White
United States Courthouse
1301 Clay Street
Oakland, CA 94612

Dear Judge White:

My name is Carol Walsh. I am retired and write to you as Paul Walsh's mother. I have known Paul every day of his life and have seen both his strengths and his struggles up close. I hope my perspective is helpful as you decide on an appropriate sentence.

Over the past year and a half, my husband and I have stayed very close to Paul. We talk with him several times a week and fly from Denver, Colorado, to visit him in Monterey, California, where he's been in treatment since June 2024. We spent Christmas there with him, went to all of his hearings, and tried our best to be present on occasional weekends and holidays – most recently over Memorial Day and July 4. These visits and calls allow us to see his progress up close.

When everything fell apart, Paul reached rock bottom. He immediately sought help and entered treatment. For the past fourteen months, he has done the hard, uncomfortable work of looking at himself honestly and changing how he thinks and lives. I am proud and thankful of the growth I've seen. He often talks about rebuilding his life in a way that fits him – less pressure, more meaning – and he is taking real steps in treatment to make that happen.

Paul has always been kind and caring. He is the kind of son who notices when someone is struggling and tries to carry some of the weight. He avoids conflict and puts others first. One small moment, from many years ago, has always stayed with me: a neighbor once remarked on how gentle and attentive Paul was with his little sister when they were playing outside, when he had no idea anyone was watching. That is who he is at his core, and I believe that goodness will guide him toward a better future.

This offense and its consequences have weighed heavily on him. He is genuinely remorseful and deeply ashamed. Because of that shame, he has often pulled back, even from friends who care about him. He has lost his career, home, and—most painfully—regular contact with his son, James, who turns 12 at the end of August. Paul's former spouse has not allowed contact between them. As grandparents, we do what we can to stay close to James and to see him when possible. When we are with him, his first question is always, "How's my dad?" Their bond is special, and seeing distance where there should be a relationship is heartbreaking.

Looking back, I also recognize parts of Paul's personality that contributed to his struggles. He has always been hard on himself—pushing himself in school and then at work—often carrying more pressure than was healthy. As parents, we tried to communicate that our only wish was for him to be happy and to find work he loved. Through therapy, I've realized that what we said and what he heard did not always match, and that our best intentions may have added to his stress. That is painful to admit, but it is honest.

Whatever sentence you impose, Paul will not face it alone. As a family, we are committed to supporting him in every way possible. He will always have a safe, stable place with us. We will continue to visit him, stay engaged in his treatment and growth, and encourage him to live up to his responsibilities, especially to his son. Our support will not change, whatever the outcome.

Your Honor, I respectfully ask that you consider Paul's progress in treatment, his sincere remorse, and the strong, reliable family support around him. In deciding his sentence, I hope you will allow him the chance to continue his progress and rebuild his life in a way that is healthier for him and better for those who depend on him, especially James.

Thank you for taking the time to read my letter.


Sincerely,


Carol Walsh

Seth Morris Mail - Letter of Support

 **Gmail**                                                    **Emily Yerlick <emily@morrisdefense.com>**

## Letter of Support

**Annie Kahr** <annie.walsh@gmail.com>                                    Mon, Aug 25, 2025 at 8:09 AM
To: admin@morrisdefense.com, seth@morrisdefense.com

Hello, I am hoping to submit a letter of support for James Paul Walsh. I am traveling, and having technical issues with my computer, so I wasn't able to format this in a separate document or sign it. I hope that it can still be submitted.


Dear Honorable Judge,

My name is Anne Kahr, previously a public health analyst and currently a stay-at-home parent. I am the younger sister of James Paul Walsh III. I am two and a half years younger, so he was a constant presence in my life for my childhood and we have been in contact and seen each other multiple times per year through adulthood. As a young person, he was always loyal, caring, and protective of me and I struggle to reconcile these charges and the pain he has caused with the thoughtful sensitive person that I have always known.

What I do know is that Paul has always been a very hard worker. When he was young, this drive was directed into sports, and fitting in with his peers and I watched him excel in varsity sports and was universally popular because of his kindness and compassion. Later, he focused this energy on academics and career advancement, and was similarly quite successful. However, each successes always seemed to come with increasing responsibilities and enormous external pressures from the threat of failure.

However, in the last year-and-a-half I have seen him re-direct this same focus and determination he has always had inward, to personal reflection and treatment. I believe he will see this through, as he has tackled and persisted with all the other challenges he's undertaken in his life. I also know that he has a small but consistent group of people who love and support him on this journey, and I intend I intend to remain part of that community for him.

Regards,

Anne Kahr
1171 NW 18th st
Bend, OR 97703

8/16/2025
Anthony Kahr MD Letter of Support regarding James Paul Walsh III

Dear Honorable Judge,

My name is Anthony Kahr I am employed as a Rheumatologist in a multi specialty practice in Bend Oregon.

I have known Paul Walsh since 2007 (~18 years), he officially became my brother in law in October of 2012 when I married his sister Annie Walsh. Over the 18 years I have seen Paul Walsh reliably several times a year. Generally this has involved shared vacations with him and our family, direct visits to see him and my nephew James (his son), as well as trips to provide emotional support during difficult times over the years. Since his initial arrest in march of 2024, we have remained in regular contact via phone and have visited in person. Generally we speak every 1-2 times per month.

Over the 18 years of our friendship I have known Paul to be a caring, hard working, and thoughtful individual. Specifically, he has made repeated efforts to build and maintain a relationship with my two children who both adore him. I have known Paul to be a dutiful brother to my wife, father to his child when able, and son to my father and mother in law in whom I am very close.

Paul has struggled with mental illness as well as drug and alcohol abuse over the course of our relationship (and prior). He has worked diligently to address these issues over the last year, has expressed regret for the pain and suffering he has caused his son and extended family and sought efforts to reform. Over the last year since his arrest, I have witnessed Paul's dedication and engagement in his recovery. Paul has often struggled to ask for help or open up fully when he is struggling in the past. Paul has a strong sense of responsibility and does not want to be a burden to others. This has unfortunately been a barrier to him getting the support he needs. Over the last 12 months Paul has been very open with his loved ones about his struggles, and his emotional needs. Specific to our relationship, I have found Paul open and honest over this last year.

I plan to offer emotional support by phone and in person upon his release. As a physician I also plan to offer him support for his mental illness and addiction recovery as a sounding board when questions arise.

I am confident in Paul's ability to rehabilitate after his release. He has shown 12+ months of dedicated inpatient and intensive outpatient dual diagnosis treatment voluntarily. Paul has suffered great consequences for his actions specifically he lost his home, he lost custody and visitation of his son, and he lost his job and economic security. His life will be forever changed by his actions and he appears to be aware of the challenges he will face moving forward. I will be there to support him in whatever way he needs in his rehabilitation (emotional support, medical support, financial support).

I appreciate your consideration.

Anthony Kahr MD

From: Katherine Kahr KatherineKahr@aol.com
Subject: **James Paul Walsh**
Date: Aug 13, 2025 at 8:03:20 PM
To: Katherine Kahr KatherineKahr@aol.com

Dear Honorable Judge,

I am Katherine P. Kahr retired psychotherapist with 52 years of clinical practice in Providence, RI and before that in Boston, MA. James Paul Walsh is the brother of my son's wife, Anne Walsh Kahr. I have known James Paul Walsh since October 2012. Many holidays and vacations have been spent with James Paul Walsh and his family over the years.
I have observed his work ethic holding a demanding job. He continued to live in an expensive community and endure long commutes to work in order to be near his son after the break up of his marriage.
During our many conversations, he impressed me with the depth of his of his thinking and the variety of his interests. He was committed to trying to understand himself.

In my relationship with James Paul Walsh, he has shown all the strength and resilience that he needs to rehabilitate himself and lead a productive life.

Respectfully,
Katherine P. Kahr, LICSW
70 Ladyslipper Lane
South Chatham, MA 02659
Sent from my iPad

Dear Judge White,                                                  September 15, 2025

My name is Courtney Goen, an educated professional with nearly twenty years as a former teacher. I am writing this letter in support of James Paul Walsh, whom I have known for six years. I am a close friend, and I have always known Paul to be a person of integrity and kindness.

I first met Paul Walsh in August of 2019. Over the years, I have seen him consistently demonstrate a tremendous work ethic and empathy for others. For example, many times Paul aimed to best support his team by taking on additional projects. Never one to cut corners, he would forego social dates to ensure he had the time to write performance reviews that were meaningful and personalized, often taking him several days and weekends to complete. This kind of commitment to others and a focus on team success are qualities I have always admired about Paul.

Paul Walsh is also a dedicated family member and friend. He is a vital part of his family and a loving parent to his son, James. I have known Paul to be a responsible and hard-working person, and a close friend to me. Paul's encouragement and championing have given me the courage to make changes in my own professional career. He is the type of friend that remembers when you have a presentation, wishes you luck before, and checks in after. His unwavering support and compassion to me and others are not only valuable, but also clear demonstrations of who he is as a person.

Without question, I understand the gravity of the situation and the seriousness of the charges against Paul. I also know these charges are not a true reflection of his character and are the result of Paul's struggle with addiction and his emotional wrestling with self-worth. These struggles have plagued Paul for years. I witnessed these struggles during the first year of COVID as Paul felt increasingly isolated and removed from friends and family. Heartbreaking to watch, I saw how the combination of addiction and a deep lack of self-love nearly broke Paul and led to temporarily losing custody of his son. Throughout 2021 and 2022, Paul threw himself into work, unhealthily so but with great achievement, and eventually resumed custody. Additionally, Paul continued to be a good friend and support, true to his character. However, he continued to quietly struggle with addiction and feelings of self-hate, culminating in the events leading up to March 2024.

I believe these events are in no way a representation of who Paul is at his core. In the six years we have been close friends, I have only witnessed a loving and integrous person; a gentle person, but one who has also suffered from addiction and emotional illness.

I know that Paul is remorseful for his actions and is committed to seeking help and rebuilding his life. Unlike during COVID, Paul is not quietly addressing his addiction and emotional health. Rather, he began in-patient treatment in mid-March 2024 and has been in long-term, immersive outpatient since June of 2024.

Talking several times a week and seeing Paul monthly throughout his journey of treatment, Paul has transformed in that he is beginning to value his own self-worth and is confronting his struggles head on. He is devastated by his actions but refuses to give up on his own recovery. I continue to witness his kindness, patience, and empathy towards others in his community at Harmony Place, as a Hospice

volunteer, and as a good neighbor.  He is also attending community college exploring creative writing and being vulnerable in a new intellectual setting—a far cry from the overworked, high stress work environment that I watched take a devastating toll on Paul's health.

In sum, I continue to see Paul as he truly is, a person of benevolence and intelligence.  I have always known Paul to take on intellectual challenges at work and to grapple with high level questions of social dynamics outside of work. What I am seeing now in addition to these qualities is that Paul is unafraid to tackle perhaps his hardest challenge to date—forgiving and loving himself in the face of confronting his past. And true to his nature, I know Paul will work tirelessly towards success. I look forward to continuing our close friendship during and after release.

Based on my long-standing friendship with James Paul Walsh, I am confident in his capacity for rehabilitation and reconciliation.

Thank you for your time and consideration.

Respectfully,

Courtney Goen

# Exhibit B



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

Dr. Mark Schwartz
*Clinical Director*
Harmony Place Monterey

Name: James Paul Walsh
Date of Birth: December 18, 1980

September 1, 2025

## Psychological Report

Mr. Walsh was admitted to Harmony Place Monterey (HPM) on May 28, 2024 after 60+ days of residential treatment at Duffy's Napa Valley Rehab. As the co-founder and clinical director of HPM, I am selective about the clients that I personally treat but agreed to take him on for individual psychotherapy during his time here. At the time of this letter, he has now been in intensive outpatient treatment and under my care at HPM for 15 months.

I am a licensed psychologist in Oregon, Marriage and Family Therapist in California, and an LPC in Louisiana. I trained at Johns Hopkins University where I received a joint Doctor of Science degree from the Department of Psychology and the School of Public Health. Following my academic training, I worked at Johns Hopkin's Antiandrogen Sex Offender Project and Master's and Johnson's pioneering human sexuality research laboratory. In a career now spanning 50 years, I have worked for probation offices, set up a sex offender prison program, and evaluated many individuals accused of or convicted of sexual offenses. I have also served as a forensic psychologist for many years, providing expert witness testimony and assessing dangerousness for the courts. I have directed a state funded program for child sexual abuse in both Missouri and Louisiana. Additionally, I have edited a book on Sexually Compulsive Behavior and written numerous textbook chapters and publications. I have supervised many



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

clinicians in this specialized area and taught 150,000 more. I say all this because experience is critical in assessing and working with this population.

I founded Harmony Place based on research and my own clinical experience that long-term recovery requires identification and resolution of the root cause of addictive, compulsive and self-destructive behavior through intense, depth psychology and supportive psychiatric care. Our clients present with mental health, substance abuse, eating, self-harming and intimacy disorders (often comorbid). We often find that these problematic behaviors are maladaptive survival strategies rooted in childhood trauma, neglect and attachment issues. It is my experience that when we address the core issue(s), clients can break longstanding patterns of chronic relapse and go on to lead happy, productive lives. The HPM program includes three to six hours of daily group therapy and education, individual psychotherapy three times a week, and regular (initially weekly and at least monthly) sessions with an in-house MD and Certified Addiction Medicine fellow with 35+ years of experience. This evidence-based mix of intense psychotherapy, psychoeducation, and medically-assisted treatment has proven effective with individuals who have completed other programs but continue to chronically relapse. We only offer intensive outpatient services so that clients can benefit from longer duration of treatment, usually 3-4 months.

My extensive background assessing and treating sex offenders and the breadth and depth of my treatment of Mr. Walsh over the past 15 months provide important context for this treatment summary and psychological evaluation, in which I will document: 1) Initial Client Impressions, 2) Client Background: Family and Social History, 3) Factors Contributing to His Behavior, 4) Psychiatric Summary, 5) Assessment of Dangerousness and 6) Progress and Prognosis. I am aware of the charges in the case (one count - a violation of 18 U.S.C. §§ 2252(a)(4)(B) & (b)(2) - Possession of Child Pornography) and have reviewed the discovery and police report along with some of the evidence.

**Initial Clinical Impressions:**



## HARMONY PLACE MONTEREY
### DR. MARK SCHWARTZ | LORI GALPERIN LCSW

Upon intake to HPM and in the early phase of treatment, Mr. Walsh reported significant distress including feelings of sadness, fear, hopelessness, interpersonal avoidance, low self-worth, exhaustion, and numbness.  He had been in treatment for many years for Major Depressive Disorder and had an entrenched pattern of self-injurious behavior including drug and alcohol abuse and overdoses, binge eating disorder, risk-taking and persistent suicidal ideation. He also reported a significant degree of somatic and emotional dissociation, a sense of disconnection from himself and others. I found Mr. Walsh to be highly motivated, extremely bright, willing to complete everything assigned and self-driven to bring research and reflection to groups and therapy that helped advance his progress. He felt like he had "hit bottom" and was desperate to face and understand his emotional and behavioral struggles and to start a new chapter in his life.

### Client Background Including Family and Social History:

I was able to evaluate Mr. Walsh's parents and sister on several occasions and learn family history. Several factors seemed to contribute to his presenting issues.  Mr. Walsh describes himself as a quiet, compliant child with a rich inner world.  He developed speech late, speaking only a few words by age two and a half.  As a sensitive child, he describes internalizing his emotions in response to parents who rewarded his high-functioning self-sufficiency, praising him for being "good and easy."  His father is a mountaineer and extreme sports and exercise enthusiast.  Family activities centered on his father's interests where he modeled the ethic of pushing oneself through physical and emotional discomfort.  Both of his parents are very loving but also carry a great deal of trauma from their own childhoods which impaired their ability to attune to the emotional needs of young Mr. Walsh. In short, he lacked the emotional responsiveness and modeling required to develop healthy coping mechanisms. Instead, he was rewarded beginning in his childhood for his ability to tolerate and mask pain and distress, both physical and emotional, and to execute on other's expectations of him.  Between the family environment, the culture in which he grew up, and the experience of early childhood trauma, he learned early to dissociate early in life.  Dissociation is a natural coping mechanism that can provide a temporary buffer from painful feelings and sensation in healthy individuals.  However,



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

dissociation became one of his primary coping strategies for distress and, as will be discussed later, he meets the diagnostic criteria for a dissociative disorder.

His family reports that Mr. Walsh has always been well-liked by his teachers, coaches, employers and friends.  As a youth, he was an excellent student and an accomplished athlete. As an adolescent, he began to put an unhealthy amount of pressure on himself to succeed while keeping any struggles private and using dissociation and then drugs and alcohol to manage distress. When his drinking became problematic in his mid twenties, he sought treatment and then maintained sobriety for the next 10 years.  During this time he maintained a large group of friends, attended graduate school, married his long-term girlfriend, had a son, and progressed in his career to increasingly demanding roles and responsibilities.  It is not surprising that he ultimately found success in a very high-pressure, crises-driven professional environment that continued to reward him for the skills developed in childhood, namely compliance to authority, composure in stressful, high-stakes environments, emotional containment, and subjugation of his own needs and emotions.

**Factors Contributing to Behaviors**
Starting in around 2015, chronic stress in his personal and professional life led Mr. Walsh to seek psychiatric treatment for emotional numbness, exhaustion and an inability to concentrate. He was diagnosed with Major Depressive Disorder and ADHD and prescribed medication. His overwork and exhaustion took a toll on his marriage, and he began using the prescribed stimulants to help keep up with the demands on his time and energy.

Mr. Walsh's symptoms present as a numbing or disconnection from his body and his emotions and progresses to exhaustion as the dissociated distress becomes overwhelming.  His exhaustion (a "shut-down" response), exacerbated by an undiagnosed case of severe sleep apnea, led to a dependence on prescription amphetamine stimulants.  When prescribed stimulants were no longer available to him,  he switched to stimulants obtained on the street i.e. methamphetamine.



## HARMONY PLACE MONTEREY
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

In 2017, as the result of his struggles with mental health and substance abuse, he lost his job, his wife filed for divorce, and he lost the support of the community of friends they had shared since college. He agreed to drug and alcohol testing as a condition for visitation with his son. He took a job working in corporate transformations, another high-pressure, demanding environment. He continued to struggle to manage his (yet-to-be-diagnosed) dissociative disorder while sober from amphetamine. In 2020 during the height of the Covid lockdowns, he relapsed on methamphetamine and lost visitation with his son for the next year-and-a-half. He became increasingly isolated and withdrawn from relationships, which he saw as being emotionally dangerous. As the result of the damage he had caused himself and those he loved, he developed feelings of self-contempt and worthlessness and became suicidal and self-destructive. With few remaining relationships, he turned to the Internet and pornography to fill a relational void.

His struggles became more pronounced as the emotional distress in his life accumulated. The dissociation served to protect him from intolerable emotions but at the cost of connection with himself and others. He used drugs and risk-taking as a way to break through the chronic state of numbness, to feel something, however temporary, but which ultimately only deepened his dissociation and despair. This became a downward spiral that ended with his arrest.

As a final aside, chronic developmental stress can impede the development of healthy help-seeking behaviors and we see this as a contributing factor in Mr. Walsh's behavior. Rather than reach out for help, he hid his emotional distress behind a veneer of career success only to see it acted out in unconscious bids for support. His self-destructive behaviors can partially be understood as a maladaptive way of signaling his intense internal distress the only way he knew how.

After spending significant time with Mr. Walsh, I believe that the behavior that led to his arrest was aberrant, out-of-character behavior driven by drugs and sensation-seeking to break through the feeling of numbness. To link this back to Harmony Place's treatment philosophy: the drugs and reckless behaviors were a maladaptive way of dealing with the underlying issue–a decade-



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

long struggle with a dissociative disorder which became problematic under conditions of chronic, extreme stress.

**Psychiatric Assessment:**

Mr. Walsh's primary diagnoses are a Dissociative Disorder and Substance User Disorder. He also meets the criteria for the dissociative sub-type of PTSD. The dissociative disorder and PTSD are medical conditions that are highly treatable once properly diagnosed. His Substance Use Disorder was a maladaptive way of self-medicating a dissociative disorder. When he arrived at HPM, he was taking a large number of prescribed psychotropic drugs for MDD, ADHD, and Social Anxiety. His symptomology overlaps with MDD and ADHD but his diagnoses require different psychotherapeutic and psychiatric interventions. As we understood his case more fully, we were able to titrate off most of those medications and found highly-effective medications for his condition. His self-reports indicate that the symptoms of dissociation have been resolved.

**Assessment of Dangerousness**

Nobody wants to risk a child being harmed, neither the court, probation, attorney nor therapist. Therefore, experience and objectivity are critical in assessing dangerousness and manipulation. In the section, I will comment on objective criteria that are commonly used in such an assessment and relate relevant observations from my time treating Mr. Walsh.

**Denial and minimization:** Initially most individuals minimize or deny behaviors outside of their value system, even to themselves. The clinician can pick up subtle contradictions, the lack of coherency. He has openly admitted that he was guilty of the charge against him from the beginning of treatment. Early on in our process, I did pick up subtle contradictions and confronted Mr. Walsh directly. He quickly became aware that it was critical to be scrupulously honest with me and after that I have not noted any inconsistencies in his reporting. I believe that he has been open and honest with me.

Harmony Place Monterey | 831 747 1727 | 574 Cortes Street | Monterey, CA 93940
www.harmonyplacemonterey.com

6



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

**Deviant sexual interest in minors:** Mr. Walsh's relationship history demonstrates that his primary sexual interest is adult females.  Furthermore, he does not conform to the standard typologies of pedophiles. Certain offenders have built-up motivational energy based on a sexual preference for children which has characterized their sexual attraction pattern throughout their lives. This is not the case for Mr. Walsh.  His behavior is best explained under the category of situational offender, where, for example, conditions of chronic stress, intoxication to drugs or alcohol, social isolation and a momentary lack of empathy, etc. result in an impulsive act.  Mr. Walsh's behavior is clearly of this latter category and not the former.

An obvious question is: should Mr. Walsh relapse on substances, would there be a risk of dangerousness.  In my experience, amphetamine abuse disinhibits and creates tolerance that opens a door to deviant arousal in many individuals.  However, there is a great deal of research that finds viewing child pornography does not dictate acting on it.  Mr. Walsh has never had sexual interactions with an underage person.  The only data suggesting the presence of deviant sexual interest in minors is that presented in this case.  His sexual functioning with adult women is typical and he has no history of sexual dysfunction with adult female partners, another positive prognostic indication.

**Alcohol and Drug Addiction:**  Mr. Walsh has consistently sought rehabilitation and treatment for his chemical dependency and has maintained long periods of sobriety.  However, these treatments did not address the underlying issues previously discussed and he returned to environments and triggers that contributed to his dissociative disorder and chronic unhappiness.  This ultimately led to relapse.  He now recognizes this pattern and is committed to re-building his life in a way that supports his sobriety. I believe that he sincerely desires long-term recovery and that with appropriate lifestyle changes he is at low risk of relapse.

**Criminal History:**  Mr.  Walsh's only previous law enforcement interactions were misdemeanor offenses (DUI, Vandalism) from over twenty years ago and were not of a nature that is relevant for my assessment of dangerousness. It is noteworthy that following these misdemeanors he maintained sobriety for ten years.



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

**Mental Health:** Certain mental health disorders present greater danger than others. For example, clients with bipolar disorder can become impulsive and present a risk during the manic phase. Mr. Walsh has no indication of bipolar disorder, autism, narcissistic or antisocial personality disorder. Mr. Walsh demonstrates healthy impulse control now that he has maintained sobriety for over a year. Emotionally, he recognizes a shift internally as he has resolved past trauma and I believe his dissociative symptoms have remitted. His diagnoses are highly treatable and with the lifestyle changes he has already made are unlikely to reappear.

**Education and Meaningful Work:** Intelligence, education and career aptitude are prognostic of treatment success. Mr. Walsh has an MBA from a prestigious university and has been successful in his career. He has a long history of employment and will likely excel in whatever he attempts. However, his outward success in stressful, crises-driven business environments took a toll on his physical and emotional health. Chronic stress impairs the executive control needed to maintain emotional equilibrium and to exercise good judgement. In our work I have encouraged him to find another less-stressful career in which he can be of service. He recognizes the need for change, and has found he loves supporting other clients in group and has read many of the books on my shelf. He has also spent time volunteering with the local hospice organization. I think he can be of great help to others in some capacity in the helping professions. This is a strongly positive prognostic indication.

**Social skills:** Mr. Walsh is charismatic and makes friends easily. His profile is inconsistent with antisocial or narcissistic personality disorders which are commonly associated with repeat sexual offenders and more intractable patterns of interpersonal deviance. This was confirmed with his score on my assessments of antisocial features using the criteria set by Hare (1991) or Samenow (1976). His extroversion and social maturity is also a positive prognostic indicator.

**Marriage:** Mr. Walsh has had a number of love relationships with adult women and has the capacity for strong attachments and bonding. We have worked on the patterns of avoidance that developed after his divorce and he hopes to find a long-term romantic partner.



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

**Family history:** Mr. Walsh's parents are capable of great love for their children and each other. I have brought them all together for family therapy sessions where I saw their support for their son first-hand. They were able revisit and discuss Mr. Walsh's childhood and to commit jointly to building new ways of relating to one another. Mr. Walsh for his part is committed to being open with his parents about his struggles and in doing so allowing them to support him. It has been my experience that having an intact loving family creates a great deal of resiliency, and it has allowed Mr. Walsh to utilize this time of crises to heal himself. This is most certainly a positive prognostication.

**Victim Empathy:** Perhaps the most important criteria I have discovered over my years of experience in genuine victims empathy. Mr. Walsh has a high degree of natural empathy. Much of our work was focused on resolution of Mr. Walsh's dissociative processes that had blunted his emotional world and required fragmentation and compartmentalization. Early traumatic experiences encountered in disorganized attachment to caregivers engender dissociative responses and defenses. In pathological dissociation, the short-term defense becomes a long-term, chronic maladaptive state with the same goal of reducing distress. But this has the side-effect of a diminished ability to feel and read emotions which can impair empathy and relationships. In the course of our treatment, there has been a major shift in Mr. Walsh's personality and I have seen his natural empathy re-emerge. He now demonstrates deep compassion for the victims of child pornography. I have also seen him respond emotionally and with great care to his peers in our group therapy sessions as he has seen firsthand the devastating effects that child abuse can have on the lives of others. He is now at a place where I can call this a positive prognostic indicator.

**Summary:** Each actual and clinical criteria suggest that Mr. Walsh is at the lowest risk for dangerousness and recidivism. In my opinion he is not a pedophile and instead his behavior is best explained as a desperate attempt to break through feelings of numbness with reckless, illicit behaviors. I believe the downloading of pornography was situationally dependent on



## HARMONY PLACE MONTEREY
### DR. MARK SCHWARTZ | LORI GALPERIN LCSW

chronic mental health difficulties which manifested in a harmful episode linked to stimulant abuse and not a deviant interest in children.

**Progress and prognosis:**

At the time of this letter, Mr. Walsh has been at Harmony Place Monterey for 15 months, at considerable personal expense. The duration and depth of Mr. Walsh's treatment at HPM are remarkable. He has demonstrated a sincere interest in rehabilitation, and I have seen him work as hard for his recovery as anyone in my career. He has grieved the loss of his son, marriage, and career—losses for which he paid a high price due to his behavior. We have tested his urine weekly for drugs and alcohol, and he has remained sober with zero cravings for substances. Through psychotherapy, medically-assisted treatment, and practicing healthy behaviors, he has resolved the dissociative symptoms that were beneath his substance abuse and out-of-character behavior. He was able to experience intense emotions and show compassion for those harmed directly and indirectly by his actions, making amends and working in 12-step programs.

Mr. Walsh intends to continue at HPM through sentencing which will be 1.5 years of continuous, intensive treatment. Going forward, he is committed to stopping over-achieving and finding a less demanding profession, one aligned with his innate capacities and highly sensitive disposition. His family interactions are loving, and his parents are extremely supportive. Mr. Walsh's history shows a consistent, long-term commitment towards rehabilitation and to maintaining a law-abiding and responsible lifestyle. The factors in his profile that would indicate possible risk to the community are dynamic, addressable factors that have been central to his treatment at Harmony Place. Specifically, it is critical that he continues to rebuild a community of supportive relationships, find a new line of work that uses his considerable talents while relaxing his perfectionistic and ambitious drives, and uses his newfound reconnection with his body and emotions to recognize and care for his own needs by utilizing health coping mechanisms. In doing these three things, I am highly confident that he will not need to rely on the maladaptive coping mechanisms discussed throughout this document.

Harmony Place Monterey | 831 747 1727 | 574 Cortes Street | Monterey, CA 93940
www.harmonyplacemonterey.com



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

**Conclusion:**

It is my opinion that his intensive psychotherapy program has been successful, and he is at low risk for relapse, particularly given the multiple consequences related to legal issues and career costs. I have provided Mr. Walsh with state-of-the-art treatment and he has worked as diligently as any patient in my many decades of clinical work.  I do not believe any child is at risk of harm and it is unlikely he will relapse on substances. I base this judgement on 1) clinical assessment and 2) empirical evidence related to commonly agreed upon static and dynamic factors.  Rarely do I state such a prediction but his extensive work has resulted in characterologic transformation and trauma resolution such that his dissociation is no longer a relevant issue. I believe the downloading of pornography followed a prolonged struggle with mental health and was linked to a binge of self-destructive behavior, secondary to stimulant abuse and not a deviant interest in children.

If ever there was a case that deserves special consideration, this would be it.  A prolonged prison sentence works counter to the continued rehabilitation goals outlined above.  Given the opportunity, Mr. Walsh will go on to use this experience and his unique talents to help others with similar struggles, which would benefit society more broadly than retributive punishment.  If ever there was an argument for leniency, I strongly support the court's consideration.

Sincerely,

Dr. Mark Schwartz
*Clinical Director*
Harmony Place Monterey

Dr. Lee Goldman
*Medical Director*
Harmony Place Monterey

Harmony Place Monterey | 831 747 1727 | 574 Cortes Street | Monterey, CA  93940
www.harmonyplacemonterey.com

11



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

Dr. Mark F. Schwartz
574 Cortes Street
Monterey, CA 93940

February 28, 2025

Honorable Judge Jefferey S. White

Judge of Oakland Courthouse

Courtroom 5 – 2nd Floor

1301 Clay Street

Oakland, CA 94612

RE: Paul Walsh, Case Number CR240487

Dear Judge White,

This letter is written to provide my opinion regarding the sentencing of Paul Walsh, who has been under my care since May 10, 2024, receiving daily treatment in Partial Hospitalization for 5-6 hours per day and Intensive Outpatient Hospitalization for 3 hours per day.

I have specialized in the treatment of sexual compulsive behaviors for the past 50 years and have directed or consulted with programs in prison, probation, and hospital-based settings over that period. Additionally, I have trained more than 100,000 professionals. I have worked at the John Hopkins Clinic and the Masters & Johnson Programs. I have been an expert witness in numerous cases and have assessed dangerousness for the courts. I am licensed as a

psychologist in Missouri and Oregon, a Marriage and Family Therapist in California, and an LPC in Louisiana.

With this broad experience, I have provided state-of-the-art treatment to Paul, and he has worked as diligently as any patient I have had for recovery. The combination of hypersexuality, amphetamines, and alcohol is particularly difficult, requiring monitoring of abstinence on a biweekly basis. Paul has maintained abstinence, experienced minimal cravings, and has also abstained from pornography. In my opinion, he is not a pedophile but was instead triggered by a variety of factors secondary to his amphetamine abuse and prescriptions for stimulants.

I do not believe any child will be at risk, and it is unlikely that he will relapse on substances. I base my judgment on (1) clinical assessment (2) empirical evidence related to static factors such as psychopathy and no prior offenses and drug addiction, and have (3) recommended actuarial assessment. His sexual arousal patterns and attachment patterns are primarily hetrosexual, but his molestation by a boy set him up for internal confusion.

Rarely do I state such a prediction but his extensive work has resulted in charactuologic transformation and trauma resolution such that the reenactment of his childhood molestation and resulting dissociation has been resolved.

If there was a case that deserves special attention in sentencing, this case would be somewhat unique. I believe Paul will move on to help other individuals with a history of child molestation heal from the suppression of shame and resulting duplicity.

Respectfully,

Dr. Mark F. Schwartz
Clinical Director
Harmony Place Monterey

2



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

08/27/2025

Re: James Paul Walsh

Dear Honorable Judge

I am Lori Galperin, MSW, LCSW and I am writing in regard to James Paul Walsh in order to share my observations and some clinical impressions.

I occupy the role of Senior Therapist at Harmony Place Monterey, a treatment program in Monterey, California. I am additionally one of its co-founders. Mr. Walsh has been a client at Harmony Place for the past 14 months.

During my almost 39 years as a therapist, I have established and clinically co-directed several programs. In various of these contexts, I have worked extensively in the areas of treating sexual trauma and sexual compulsivity. Often, they are two sides of a coin. In the course of my career, I have also worked with incest families, and with individuals who had, or came close to having, committed a sexual offense.

In my clinical experience, I have observed clear distinctions between pedophiles and people whose use of drugs and alcohol led them down a self-destructive path which culminated in out-of-character behaviors that otherwise would not have occurred. Mr. Walsh seems to me clearly the latter. I think his life became unmanageable, self-destructive behaviors spiraled and he downloaded pornography that landed him in the extreme jeopardy in which he now finds himself. I do not believe he is in any way inclined to hurt children- sexually or otherwise. He in fact seems the type of person who likely would step in front of an oncoming vehicle to spare a child, or any vulnerable being or creature from harm.

Over the last 14 months, being in innumerable groups, in family & individual sessions with Mr. Walsh, I have witnessed his decency, care and genuineness- and his growth. I very much hope that the outcome of sentencing allows Mr. Walsh the use of his capacities for prosocial ends. He is a person who, now more than ever, is capable of deeply meaningful contributions in ways that could benefit many.

**Lori Galperin, MSW, LCSW**
Senior Therapist
Harmony Place Monterey

 # HARMONY PLACE MONTEREY

## Lee Goldman M.D.
574 Cortes Street Monterey, CA 93940
CA License - G36404
FAX: (831) 373-3821

11/17/2025

**Re:** James Walsh

**Current Address:**
24987 Fair View Avenue
Hayward, CA 94542 USA

**DOB:** 12/18/1980

To Whom It May Concern,

This letter is to confirm that Mr. James Walsh admitted to Harmony Place Monterey on May 28, 2024 for treatment in our Partial Hospitalization Program (PHP). Mr. Walsh remained in PHP until stepping down to the Intensive Outpatient Program (IOP) level of care on October 1, 2024. He was formally discharged from treatment on October 31, 2025.

Please see below for details regarding his treatment participation and levels of care:

**Partial Hospitalization Program (PHP)**
• Participation: May 28, 2024 – September 3, 2024
• Services provided: Monday through Friday, 8:00 AM – 2:30 PM

**Intensive Outpatient Program (IOP)**
• Participation: October 1, 2024 – October 31, 2025
• Services provided: Monday through Friday, 9:00 AM – 12:30 PM
• As of the week of December 30, 2024, Mr. Walsh transitioned to attending three days per week and continued on this schedule until his discharge on October 31, 2025

_Lee Goldman MD_

**Lee Goldman M.D.**
**Medical Director**
**License # G36404**



**HARMONY PLACE MONTEREY**
DR. MARK SCHWARTZ | LORI GALPERIN LCSW

Dr. Mark Schwartz
Clinical Director
Harmony Place Monterey

Name: James Paul Walsh
Date of Birth: December 18, 1980
January 28, 2026

Treatment Update February 2026

**Introduction:**

Mr. Walsh has continued to make progress on his recovery since my psychological report dated September 1, 2025. Mr. Walsh was originally admitted to Harmony Place Monterey (HPM) on May 28, 2024, after 60+ days of residential treatment. For the first five months he participated in our highest level of care attending each weekday from 8:00 am – 2:30 pm. Based on his improvement, we then stepped him down to attending Monday to Friday from 9:00 am – 12:30 pm. In February of last year, we transitioned him to thrice weekly schedule. In October 2025, we decided he was ready to move to long-term maintenance posture of once-weekly one-on-one therapy.

**Impressions:**

The following impressions and recommendations are listed following my intensive work with Mr. Walsh.

1) Throughout the twenty months, he has been strongly committed to his recovery, open and honest with the treatment team and remorseful of his harmful conduct. He has established insight into his actions and empathy for those he has injured.
2) He has demonstrated the ability to use healthy coping mechanisms in the face of distress, even with criminal proceedings pending.
3) He has resolved the dissociative symptomology, related to developmental trauma, which were contributing to his addictive behaviors.
4) He is unlikely to relapse, and no child is at risk in the future.
5) He has explored less stressful employment opportunities by enrolling in the university and utilizing his above average cognitive abilities to establish a new profession



**HARMONY PLACE MONTEREY**

DR. MARK SCHWARTZ | LORI GALPERIN LCSW

**Recommendations:**

As we titrated his treatment down, Mr. Walsh has begun to engage in vocational pursuits that I believe are a better match for his temperament and which will use his considerable talents for the good of all. His volunteering at a local hospice organization and enrolling in a graduate program in counseling demonstrates his progress and his commitment to turning this experience into a positive. I also believe that his new path he is on is therapeutically relevant given the contribution his previous career had on his dissociative disorder and self-destructive behavior.

I also stand by the treatment recommendations included in my previous report. To minimize the recurrence of dissociative symptoms, Mr. Walsh should: work to rebuild a community of supportive relationships; find a new, less demanding profession; continue to employ the healthy coming mechanisms that he has developed during his time here. His parents remain steadfast supporters of Mr. Walsh and an important source of stability and continuity for him. I suggest that he continues with long-term, one-on-one therapy and that he participates in group therapy for substance abuse and sex offenders.

Were he to receive non-custodial sentence, I would offer to continue to treat Mr. Walsh and provide regular written updates to US Probation and the Courts. However, my understanding is that the result of sentencing is likely to result in a custodial sentence. I urge you to consider the fact that a prolonged prison sentence works counter to the continued rehabilitation goals outlined above. Furthermore, I fully support the request from Mr. Walsh to participate in the Bureau of Prison's Residential Drug Abuse Program and Non-Residential Sex Offender Treatment Program during any period of incarceration. I also believe that being incarcerated near his family and community in Colorado and re-entry into that community are important considerations, given the priorities for continued treatment outline above.

Sincerely,

Dr. Mark Schwartz
Clinical Director
Harmony Place Monterey

Exhibit C



## Duffy's
### NAPA VALLEY TREATMENT

May 17, 2024

RE: James Paul Walsh

To Whom It May Concern:

This letter is to verify that James Paul Walsh was a client at this facility from March 20th, 2024 to May 17th, 2024 successfully completing our Foundational and Extended Care Programs.

While here, Paul actively participated in a recognized, licensed program of recovery for alcoholism and/or addiction. Our program introduces, models, and motivates for the 12-step program philosophy and participation, which can inspire the change of attitude, outlook and behavior that is necessary for maintaining continued abstinence. Paul received education about the bio-psycho-social aspects of addiction, and the affect it has on families. Paul attended group and individual therapy sessions twice weekly to identify and address personal issues. Peer group exchanges of hopes, fears and strengths provide effective support, and relapse-prevention skills are woven throughout the program.

Duffy's clinical staff are experienced, educated, and certified in chemical dependency treatment. They provide assessments, treatment plans, counseling, referrals, and discharge planning. Twelve-step participation, including 90-meetings in 90-days, obtaining a sponsor, working the steps, and utilizing continuing care case management are recommended for Paul.

Sincerely,

Araceli Cortez, BSW
Intake Specialist

 (707) 709-8099      www.duffysrehab.com     3076 Myrtledale Road | Calistoga, CA 94515



# Duffy's

### NAPA VALLEY TREATMENT

May 23, 2024

RE: James Paul Walsh

To Whom It May Concern:

This letter is to verify that James Paul was a client in Duffy's Outpatient Day Treatment Program from May 17, 2024 to May 23, 2024 successfully completing a 6 day (or 144 hours) program.

While here, James Paul actively engaged in a recognized, licensed outpatient program of recovery for alcoholism and/or addiction. Our program introduces, models, and motivates for the 12-step program philosophy and participation, which can inspire the change of attitude, outlook and behavior that is necessary for maintaining continued abstinence. James Paul received education about the bio-psycho-social aspects of addiction, and the affect it has on families. James Paul attended group and individual therapy sessions to identify and address personal issues. Peer group exchanges of hopes, fears and strengths provide effective support, and relapse-prevention skills are woven throughout the program.

Duffy's Outpatient Treatment Center staff are experienced, educated, and certified in chemical dependency treatment. They provide assessments, treatment plans, counseling, referrals, and discharge planning. Twelve-step participation, including 90-meetings in 90-days, obtaining a sponsor, working the steps, and utilizing continuing care case management are recommended for James Paul.

Sincerely,

Cara Olmedo, RADT
Duffy's Outpatient Program BHA 3

Duffy's Napa Valley Outpatient Treatment, 1406 Fair Way, Calistoga, CA 94515 (707) 710-9601

# Exhibit D

Clinical Report

| Progress Report & Treatment Plan Updates | HOPE Program |
|---|---|
| Date: Jan 10, 2026 | 1245 B Street |
| Author: Decker, Dawn | Hayward, CA 94541 |

| Client Name | Date of Birth | Gender | CDCR # |
|---|---|---|---|
| James Paul Walsh | Dec 18, 1980 | male | 9336763 |

| Agent of Record | Client Site | Unit Address | |
|---|---|---|---|
| truong, carolyn N/A | San Francisco | 450 Golden Gate Ave. Suite 17-6884 San Francisco CA 94102 | |

**Client Enrollment**

Federal Pretrial SOT

| Referred On | Referral Received On | Treatment Began On | Treatment Ends On |
|---|---|---|---|
| Oct 11, 2024 | Oct 23, 2024 | Nov 7, 2024 | N/A |

# Treatment Team

| Primary clinician | Contact |
|---|---|
| Decker, Dawn | p: N/A |
| | e: ddecker@hopeprogram.biz |

## Session Schedule

| Session | Frequency | Facilitator |
|---|---|---|
| 7023 - Group Pretrial | Weekly on Tuesday | Decker, Dawn |
| CTM | Monthly on first Monday | Shiflet, Kelli |

Clinical Report

# Attendance History

## Attendance Summary



- Noshow 1
- Excused 20
- Present 52

## Attendance Detail

| Session Type | Date | Start time | Attendance status |
|---|---|---|---|
| group | 11/19/2024 | 1:00 PM | Present |
| group | 11/26/2024 | 1:00 PM | Present |
| group | 12/03/2024 | 1:00 PM | Excused |
| group | 12/10/2024 | 1:00 PM | Present |
| group | 12/17/2024 | 1:00 PM | Present |
| group | 12/24/2024 | 1:00 PM | Excused |
| group | 12/31/2024 | 1:00 PM | Present |
| group | 1/07/2025 | 1:00 PM | Present |
| group | 1/14/2025 | 1:00 PM | Present |
| group | 1/21/2025 | 1:00 PM | Present |

Case 4:24-cr-00487-JSW   Document 35   Filed 01/30/26   Page 59 of 66

| group | 1/27/2025 | 9:30 AM | Excused |
| group | 1/28/2025 | 1:00 PM | Present |
| group | 2/04/2025 | 1:00 PM | Present |
| group | 2/11/2025 | 1:00 PM | Present |
| group | 2/18/2025 | 1:00 PM | Present |
| group | 2/24/2025 | 9:30 AM | Excused |
| group | 2/25/2025 | 1:00 PM | Present |
| group | 3/04/2025 | 1:00 PM | Present |
| group | 3/11/2025 | 1:00 PM | Present |
| group | 3/18/2025 | 1:00 PM | Present |
| group | 3/25/2025 | 1:00 PM | Present |
| group | 3/31/2025 | 9:30 AM | Excused |
| group | 4/01/2025 | 1:00 PM | Present |
| group | 4/08/2025 | 1:00 PM | Excused |
| group | 4/15/2025 | 1:00 PM | Present |
| group | 4/22/2025 | 1:00 PM | Present |
| group | 4/28/2025 | 9:30 AM | Excused |
| group | 4/29/2025 | 1:00 PM | Excused |
| group | 5/06/2025 | 1:00 PM | Present |
| group | 5/13/2025 | 1:00 PM | Present |
| group | 5/20/2025 | 1:00 PM | Present |

| group | 5/26/2025 | 9:30 AM | Excused |
|-------|-----------|---------|---------|
| group | 5/27/2025 | 1:00 PM | Present |
| group | 6/03/2025 | 1:00 PM | Present |
| group | 6/10/2025 | 1:00 PM | Present |
| group | 6/17/2025 | 1:00 PM | Present |
| group | 6/24/2025 | 1:00 PM | Present |
| group | 6/30/2025 | 9:30 AM | Excused |
| group | 7/01/2025 | 1:00 PM | Excused |
| group | 7/08/2025 | 1:00 PM | Excused |
| group | 7/15/2025 | 1:00 PM | Noshow |
| group | 7/22/2025 | 1:00 PM | Excused |
| group | 7/28/2025 | 9:30 AM | Excused |
| group | 7/29/2025 | 1:00 PM | Present |
| group | 8/05/2025 | 1:00 PM | Present |
| group | 8/12/2025 | 1:00 PM | Present |
| group | 8/19/2025 | 1:00 PM | Present |
| group | 8/25/2025 | 9:30 AM | Excused |
| group | 8/26/2025 | 1:00 PM | Present |
| group | 9/02/2025 | 1:00 PM | Present |
| group | 9/09/2025 | 1:00 PM | Present |
| group | 9/16/2025 | 12:30 PM | Excused |

| group | 9/16/2025 | 1:00 PM | Present |
| group | 9/23/2025 | 1:00 PM | Present |
| group | 9/30/2025 | 1:00 PM | Present |
| group | 10/06/2025 | 12:00 PM | Excused |
| group | 10/07/2025 | 1:00 PM | Present |
| group | 10/14/2025 | 1:00 PM | Present |
| group | 10/21/2025 | 1:00 PM | Present |
| group | 10/28/2025 | 1:00 PM | Present |
| group | 11/03/2025 | 12:00 PM | Excused |
| group | 11/04/2025 | 1:00 PM | Present |
| group | 11/11/2025 | 1:00 PM | Present |
| group | 11/18/2025 | 1:00 PM | Present |
| group | 11/25/2025 | 1:00 PM | Present |
| group | 12/01/2025 | 12:00 PM | Excused |
| group | 12/02/2025 | 1:00 PM | Present |
| group | 12/09/2025 | 1:00 PM | Present |
| group | 12/16/2025 | 1:00 PM | Present |
| group | 12/23/2025 | 1:00 PM | Present |
| group | 12/30/2025 | 1:00 PM | Present |
| group | 1/05/2026 | 12:00 PM | Excused |
| group | 1/06/2026 | 1:00 PM | Present |

# Risk Summary

As Mr. James Walsh has no convictions, risk assessments have not been completed.

# Goals

| Domain | Treatment area | Title | Set on | Due on |
|---|---|---|---|---|
| STABLE - 2007 | A - Significant Social Influences | Mr. Walsh will increase his level of social engagement | Jan 7, 2026 | 12/30/2026 |
| Specific | Identify and Change Thinking Errors | Mr. Walsh will identify and adaptively process events related to the pretrial process | Jan 2, 2026 | 12/30/2026 |
| Specific | Learn and Implement Self-regulation Skills to Enhance Life Stability | Mr. Walsh will explore and foster current strengths to utilize during the pre-trial process | Jan 7, 2026 | 12/30/2026 |

# Section One: Engagement & Participation in Treatment

Partially Met

# Section Two: Progress Towards Reduction in Risk (Criminogenic Needs & Protective Factors)

Partially Met

# Section Three: Additional Considerations

**Clinical Report**

- ☐ Acute Risk Factors Reported

- ☐ Family/Chaperone Training Recommended

- ☐ Psychiatric Referral Recommended

- ☐ Substance Use/Abuse Reported

- ☐ Further Assessment Recommended

- ☑ N/A

# Overall Clinical Comments

Mr. James Walsh began attending 1.5-hour weekly Telehealth groups with HOPE Programs on November 17, 2024. He has nearly perfect attendance (he missed one group on 7/15/2025) and has attended 52 group sessions.

Mr. James Walsh has consistently improved his emotional awareness and developed coping strategies through Cognitive Behavioral Therapy (CBT) to help him navigate the pretrial process. He has engaged in group discussions on psychoeducational topics. Some of these topics include: Cognitive Distortions, Healthy Relationships, Intimacy, Stages of Attachment, Denial, Strategies to Combat Loneliness, Healthy Boundaries, Vulnerability, Effective Communication, Healthy Sexuality, Understanding Emotional States, Shame vs. Guilt, Childhood Experiences, Parenting Styles, and Addiction and Recovery.

Mr. James Walsh has continuously and successfully set and accomplished goals. He remains engaged, cooperative, and receptive to therapeutic interventions. He also works well with others, stays open to feedback, and offers positive affirmations. Further treatment is strongly recommended to continue addressing Mr. Walsh's difficulties with maladaptive schemas, enhance adaptive coping mechanisms, and support his process of stressors inherent in the legal process. Continued therapy should promote better stress tolerance and relational skills, alongside strengthening personal accountability and self-awareness of the elements underlying his legal circumstances. Continued participation in treatment will be significant in helping him navigate the pretrial process with stability and to reduce risk through improved emotional regulation, problem-solving, and prosocial engagement.

# Treatment Modification

## Requested Frequency of Treatment

Remain the same frequency of treatment

## Agency Representative Comments

No additional comments.

| Created by: | Created on: |
|---|---|
| Decker, Dawn | Jan 10, 2026 |
| Approved by: | Approved on: |
| Kelli Shiflet | Jan 13, 2026 |

*Dawn Decker*

**United States of America vs. James Paul Walsh III**
**CR-00487-JSW**

## PROOF OF SERVICE BY EMAIL

I am a citizen of the United States. I am over the age of 18 and not a party to the within action. My business address is 2025 Rose Street, Suite 200, Berkeley, California 94709.

On January 30, 2026 I served the foregoing SENTENCING MEMORANDUM on the following person(s) by sending a true copy thereof via email to the following parties:

Zachary McCandless Glimcher
Assistant U.S. Attorney
via email: Zachary.glimcher@usdoj.gov

Salvador Tinoco
U.S. Probation Officer
via email: Salvador_Tinoco@canp.uscourts.gov

I certify or declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of January 2026 at Berkeley, California.

Sincerely,

MORRIS LAW, PC

_____

CELA PARKER
Legal Assistant

25

**United States of America vs. James Paul Walsh III**
**24-CR-0487-JSW**

**<u>PROOF OF SERVICE BY EMAIL</u>**

I am a citizen of the United States. I am over the age of 18 and not a party to the within action. My business address is 2025 Rose Street, Suite 200, Berkeley, California 94709.

On January 30, 2026 I served the foregoing SENTENCING MEMORANDUM on the following person(s) by sending a true copy thereof via email to the following parties:

Zachary McCandless Glimcher
Assistant U.S. Attorney
via email: Zachary.glimcher@usdoj.gov

Salvador Tinoco
U.S. Probation Officer
via email: Salvador_Tinoco@canp.uscourts.gov

I certify or declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of January 2026 at Berkeley, California.

Sincerely,

MORRIS LAW, PC

CELA PARKER
Legal Assistant

25